## SOUTHERN PAC. R. Co. *v.* DOYLE.

### *'Circuit Court, D. California.* April 3, 1882.)

**1. MORTGAGE—CONVEYANCE IN TRUST.**

The conveyance of lands by the Southern Pacific Railroad Company to Mills and Tevis, in trust, to secure the payment of certain "first-mortgage bonds," in the usual form of a mortgage, except being to trustees, with a condition of defeasance, providing that upon the payment of the bonds "this indenture and the estate hereby granted shall cease and determine," etc., reserving to the grantor the "sole and exclusive management and control" of the lands, and only providing for an entry, foreclosure, and sale by the trustees upon default and subsequent demand by the bondholders, is in substance and law a mortgage under the California Code; and the right of possession until default, and a demand by the bondholders, remains in the mortgagor or grantor.

**2. MORTGAGE, SALE UNDER—RIGHT OF POSSESSION.**

Under the Code, a mortgage may confer a power of sale upon the mortgagee, "or any other person," after breach of the obligation secured. Where the power is conferred upon any person, other than the party secured, it necessarily embraces a trust; but it does not necessarily give a right of possession to the trustee, at least not before condition broken.

**3. TRUST DEED—RIGHT TO POSSESSION UNDER.**

If the instrument in question, under the Code, is strictly a trust deed, rather than a mortgage, the result is the same in either case; for it conveys no right to the possession, management, or control of the lands upon the trustees till after default, and a demand by the bondholders.

**4. EXPRESS TRUSTS.**

Express trusts may be created to sell real property and apply or dispose of the proceeds, but only "in accordance with the instrument creating the trust;" and, in this instance, the lands conveyed by the terms of the deed are left in the sole and exclusive management, control, and possession of the grantor till default and demand.

**5. SAME—TITLE VESTED.**

Under the Code, every valid express trust vests the title, subject to the execution of the trust, in the trustees, and not in the beneficiaries.

6. ESTATE—WHAT VESTS IN TRUSTEES.

Whatever the estate may be, created by the trust deed, the whole is vested in the trustees; but the estate which vests, its extent and quality, *depend* wholly upon the terms of the instrument creating the trust, and not upon the Code.

7. SAME—ESTATE NOT EMBRACED.

Where an express trust is created in relation to real property, every estate not embraced in the trust, and not otherwise disposed of, is left in the author of the trust.

8. TRUST ESTATE—MANAGEMENT AND CONTROL.

The sole, exclusive management, control, and possession of the land in question, being by the express terms of the trust deed, or mortgage in question, left in the grantor till default and demand by the bondholders, this portion of the estate was not embraced in the trust, and is left in the author of the trust.

9. SAME—RIGHT OF ACTION AGAINST TRESPASSERS.

The right of possession, management, and control of the lands embraced in the mortgage, or trust deed, being by the terms of the instrument left in the grantor, the right of action to recover possession against trespassers is also in the grantor.

In this case, the defendant, in addition to the points heretofore made in the case of the *Southern Pac. R. Co.* v. *Orton,* 6 Sawy. 157, and the several cases tried with it, and the case of the same plaintiff against Pryor, now claims that before the institution of this action, plaintiff conveyed all the lands derived under the congressional grant to D. O. Mills and Lloyd Tevis; and that, at the date of the commencement of this action, the legal title, right of possession, and, consequently, the right of action were in said Mills and Tevis, and not in said plaintiff; and for that reason said plaintiff cannot recover.   To establish this defence the defendant introduced in evidence an indenture made by the plaintiff to said D. O. Mills and Lloyd Tevis, bearing date April 1, 1875, duly acknowledged and recorded in the several counties through which the road is located and in which the lands are situated.   The recitals and provisions of said deed material to this question are as follows:

"Whereas, the party of the first part  *  *  *  is about to issue its first-mortgage bonds upon said railroad and telegraph line, and rolling stock, fixtures, and franchises, and also upon the land granted to it by congress,  *  *  * and whereas, the board of directors,  *  *  *  at a meeting of said board, at which all the members were present, did, by a resolution to that effect, which was unanimously adopted and passed, determine and direct that first-mortgage bonds upon said railroad and telegraph line, its rolling stock, fixtures, and franchises, and upon said hereinbefore described lands,  *  *  *  be prepared, executed, and issued by the president and secretary of said company;  *  *  * and whereas, the said board of directors, at the meeting aforesaid, and in the manner and form and by the vote aforesaid, did further resolve that the said series A of said bonds should be executed and issued in substantially the fol-

lowing form, which form is headed 'First-Mortgage Bonds;' and in the bond it is said: 'This bond is one of series A of the first-mortgage bonds issued, and to be issued, by the said Southern Pacific Railroad Company. * * * All of said bonds are secured by a mortgage or deed of trust, bearing even date with the bonds, * * * duly executed by said company to D. O. Mills and Lloyd Tevis, * * * as trustees, upon its railroad and telegraph lines, * * * aggregating 1,150 miles of railroad and telegraph lines, with all the rolling stock, stations, fixtures, and franchises for the permanent use thereof. * * * Also all the lands granted to said company by the congress of the United States * * * not sold or otherwise disposed of prior to the execution of said mortgage,' " etc.

The said instrument further recites that whereas congress granted to said company certain alternate sections of land, and—

"Whereas, the said board of directors, at the meeting aforesaid, and in the manner and form and by the vote aforesaid, did further direct that to secure the payment of said bonds a first mortgage upon said rolling stock, stations, fixtures, right of way, franchises, and the lands aforesaid granted by said acts of congress, not sold, or otherwise disposed of or contracted to be sold, as shown by the books of said company, should be executed under the corporate seal of said company, and be signed by the president and secretary to D. O. Mills and Lloyd Tevis, * * * as trustees for the holders of said bonds. * * * Now, therefore, this indenture witnesseth, that the said Southern Pacific Railroad Company, for the better securing of the payment of the principal and interest of the said first-mortgage bonds, and in consideration, also, of the sum of one dollar, to it in hand paid by the said parties of the second part, the receipt whereof is hereby acknowledged, has granted, bargained, sold, and aliened, conveyed and confirmed, and by these presents doth grant, bargain, sell, alien, convey, and confirm unto the said parties of the second part, and to their successors duly appointed for the execution of the trusts herein set forth, the following property, now or hereafter constituted, purchased, acquired, held in possession, and owned by said company, to-wit: The whole of the railroad and telegraph line of the said company, running from the city of San Francisco, in the state of California, in a southerly and south-easterly direction, by way of Carnadero Junction, Salinas Valley, and Polonio Pass, to the Colorado river, at or near the Needles; also, from Carnadero Junction to San Benito; aggregating 1,150 miles of railroad and telegraph lines, including all the rights of way, roadway, track, and tracks, together with all the superstructures, depots, depot grounds, station-houses, watering-places, work-shops, machine-shops, machinery, side tracks, turnouts, turn-tables, weighing scales, locomotives, tenders, cars, rolling stock of all kinds, full equipments, fixtures, tools, and all other property which may be necessarily or ordinarily used in operating or repairing the said railroad, including all of the said property which is now or may hereafter, in whole or in part, be constructed or completed, purchased, acquired, held, or owned by the said company, pertaining to said railroad, and all the corporate rights, privileges, and franchises of said company, pertaining to said road, together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging and appertaining, and

the reversion and reversions, remainder and remainders, rents, incomes, issues, and profits thereof, with all the rights, titles, interests, estate, property, succession, claim, and demand, in law or equity, of the said party of the first part, of, in, and to the same or any part and parcel thereof; to have and to hold the above-granted and described premises, property, and franchises, with all the appurtenances, unto the said parties of the second part, and to the survivor of them, and to their successors, duly appointed, upon trust and for the use and benefit of the person or persons, body or bodies, politic or corporate, who shall have become, or be from time to time, holders of the said "first-mortgage bonds," or any of them: provided, always, and these presents are upon the express condition, that if the said party of the first part, or its successors, shall well and truly pay, or cause or procure to be paid, unto the holders, from time to time, of said bonds, and each and every one of them, the said sums of money secured to be paid by the said bonds, and the interest coupons attached thereto, at the places and times, and in the manner, set forth in the said bonds, according to the true intent and meaning thereof, then these presents, and all the property, estate, right, franchises, and privileges herein and hereby granted and conveyed shall cease, determine, and be void.

" But if default shall be made in the payment of the said sums of money specified in said bonds, or in the payment of said interest coupons, or either of them, or any part thereof, and if the same shall remain unpaid for the period of six months from and after the time when the same should have been paid, according to the terms of said bonds, then the said parties of the second part, or either of them, upon the refusal of the other, or their successors in said trust, by themselves, or their agents or servants, in that behalf, may, upon request of the holder or holders of not less than one-fourth of said bonds, on which the interest or principal shall so be and have so remained in default, as aforesaid, enter into and upon and take possession of all, or, in their or his discretion, any part, of the said premises and property hereinbefore described, and work and operate the said railroad, and receive the income, receipts, and profits thereof, and out of the same " [pay certain specific charges and indebtness in the order named;] "*  *  *  or the said parties of the second part may in such case foreclose this mortgage, and sell and dispose of, according to law, all the rights, property, privileges, franchises, real and personal, with the appurtenances herein and hereby granted, or so much thereof as may be necessary, and out of the money arising from such sale pay the costs, charges, and expenses," etc.  *  *  *

"And the said party of the first part hereby covenants and agrees that if, at any time, any lands now used for depot or shop purposes, or right of way or water, or any lands not now used, but which may be hereafter used, for such purposes, shall for any cause cease to be needed or used by said party of the first part for such purposes, the said parties of the second part may sell the same at the price to be agreed upon by the parties of the first and second parts, and apply the money realized from such sale or sales to the redemption of said bonds in the manner hereinafter provided in the case of money realized from the sale of lands granted by the United States to the said party of the first part.  *  *  *

"This indenture further witnesseth, that the said party of the first part, for the purpose of securing the payment of the sums of money mentioned in

said bonds and the interest thereon, and in consideration of the premises, and also for and in consideration of the sum of one dollar to the said party of the first part in hand paid by the parties of the second part, the receipt whereof is hereby acknowledged, has granted, bargained, sold, released, enfeoffed, conveyed, and confirmed, and by these presents does grant, bargain, sell, release, enfeoff, convey, and confirm unto the said parties of the second part, as trustees, and to their successors and survivors, and their assigns, forever," [all the lands granted by the act of congress as described in the instrument.]  "To have and to hold all and singular the lands hereby granted, or intended to be granted, and each and every part and parcel thereof, with the appurtenances thereunto belonging, unto the said parties of the second part, and their successors and survivor, and their assigns forever, as trustees, for the uses and purposes, and upon the trusts, terms, conditions, and agreements in this indenture set forth and declared.

"Provided always, and these presents are upon the express condition, that if the said party of the first part shall well and truly pay, or cause to be paid, to the holders of said bonds, and every of them, the principal sums of money therein mentioned, according to the tenor thereof, with the interest thereon at the times and in the manner hereinbefore provided, according to the true intent and meaning of these presents, then, and from thenceforth, this indenture and the estate hereby granted shall cease and determine, and all the right, title, and interest in any and all property hereby conveyed to the parties of the second part, not then disposed of under the powers hereby conferred, shall revert to and vest in the said party of the first part.

"This indenture further witnesseth, that these presents and the said bonds are made, executed, and delivered upon the trusts, terms, conditions, and agreements following; that is to say: That all the lands hereinabove conveyed and mortgaged shall be under the sole and exclusive management and control of the said party of the first part, who shall have full power and authority to make contracts for the sale of the same at such price, on such credit or terms of payment, and such other conditions as shall be agreed on by the said parties of the first and second parts, and as shall seem to them best calculated to secure the payment in full of all the bonds issued as hereinbefore provided until entry or foreclosure by the trustees as hereinafter provided.   But no title to any tract of land, contracted to be sold by the said party of the first part, shall be given until the whole of the purchase money of said tract shall be paid to said parties of the second part, or their successors or survivors, in cash, or in said bonds or overdue coupons thereof.   And for this purpose it is agreed that the said party of the first part and said trustees shall cause all such lands, as they shall from time to time become subject to sale, to be carefully examined and surveyed, and shall fix to each tract or parcel such price as in their judgment shall be most judicious, having in view the interests of all parties; and said lands shall be and remain, at all times thereafter, open for sale to any person who may desire to purchase and pay therefor, the prices being, nevertheless, at all times, subject to revision and alteration by the said parties, and the party of the first part may reserve from sale any lands necessary for depot grounds, or other purposes connected with the construction or operation of

said railroad or telegraph. The purchaser of any such land shall be at liberty to pay for the same in the aforesaid bonds or overdue coupons at par; and when any tract or parcel of said lands shall have been purchased and paid for, either in bonds, coupons, or cash, as hereinbefore provided, the same shall be conveyed by the said parties of the first and second parts to the purchaser in fee-simple, and shall, by such conveyance, be absolutely and forever released from any and all lien or encumbrance for or on account of said bonds, or any other debt or obligation of the said party of the first part.   *   *   *

" The said trustees shall apply the proceeds of the sales made by them of lands hereby conveyed, to the sole and exclusive purpose of the payment of the bonds provided for in, and issued in conformity to, the terms of this indenture.  And for such purpose all such avails shall, from time to time, as the same are realized, be used in the purchase of such bonds in the market, to be cancelled, so long as purchases thereof can be made at par; and whenever such bonds cannot be purchased at that rate, said trustees shall advertise for proposals to sell such bonds to them, in two newspapers published in the city of New York, and one newspaper published in the city of San Francisco; and after receiving such proposals they shall have power to purchase such bonds at the lowest terms so offered.   *   *   *

" If any default shall be made in the payment either of principal or interest on any of said bonds for six months, after demand at the place of payment, when the same shall become due, then the said trustees may, on being requested by the holders of at least one hundred thousand dollars of such bonds, enter into and take possession of any of the lands above conveyed, and foreclose this mortgage, and may sell at public auction so much of said lands as may be necessary to discharge all arrears of such interest, and apply the proceeds, after deducting the costs, charges, and expenses of such entry, foreclosure and sale, to the payment of such arrears of interest. If any such default shall continue for one year from the time of such demand and refusal, the principal sum of all bonds then outstanding shall become due and payable, and the said trustees may enter into and take possession of all the lands above by these presents mortgaged or conveyed, foreclose this mortgage, and sell at public auction all such lands, or so much thereof as may be necessary, first giving at least six months' previous notice of the time and place of sale in at least one newpaper published in the city of New York, and in one published in each of the cities of San Francisco, Sacramento, Los Angeles and San Diego; and they shall apply the proceeds thereof, after deducting the costs, charges, and expenses of such last-mentioned entry, foreclosure, and sale, to the payment of all said bonds then outstanding, and the interest accrued thereon, rendering the surplus, if any there shall be, unto said party of the first part. In case of any sale upon any such foreclosure, or at any such public auction, the said trustees shall make, execute, and deliver a conveyance of the said lands so sold, which shall convey to the purchasers all the rights and privileges of the said party of the first part in and to the property so sold, to the same extent as the same shall have been previously enjoyed and held by the said party of the first part.

" If, after any such entry shall be made, or any such foreclosure proceedings shall be commenced, for the satisfying of interest only, as above provided,

and before the lands are sold thereon, the said party of the first part shall pay and discharge such interest, and deliver the coupons therefor to the said trustees, and pay all the costs, charges, and expenses incurred in such entry and foreclosure, and the proceedings thereon, then and in every such case the said trustees shall discontinue their proceedings thereon, and restore to the said party of the first part all of such lands, to be held subject to the above conveyance and mortgage, and subject to all the provisions, terms, and conditions of these presents, in like manner as if such entry had not been made, nor such foreclosure proceedings commenced. * * *

"Whenever all the bonds which shall have been made and issued by the said party of the first part under and in conformity to the provisions of this indenture, with the interest thereon, together with all the expenses incurred by the said trustees in the execution of the trust herein and hereby created, shall have been fully paid or satisfied, the said trustees shall reconvey to the said party of the first part all and singular the said lands then in the hands of the said trustees, and not before that time sold or disposed of in the execution of the trust hereby created."

*Lake & McKoon,* for plaintiff.

*H. E. Highton* and *H. E. McBride,* for defendant.

SAWYER, C. J.   It is claimed by the plaintiff that the instrument in question is only a mortgage with a power of sale, the legal title and right of possession remaining in the mortgagor; while the defendant asserts that, under the provisions of the Code and the decisions of the courts of California, it is a trust deed which vests the legal title and the right of possession in the grantees and trustees, Mills and Tevis, and that the right of action in this case is vested in them alone.

In *Platt* v. *Union Pac. R. Co.* 99 U. S. 57, the supreme court of the United States held a similar instrument to be a mortgage. Says the court: "The instrument, we think, though in form a deed of trust, was substantially a mortgage." The dissenting justices also regard it as a mortgage. But the defendant urges that the Civil Code of California controls the case, and that, under the Code, the instrument is not a mortgage, but a deed of trust passing the legal title. Upon an examination of the instrument and the provisions of the Code it seems to answer the description of a mortgage as well as it does that of a trust deed. It is certainly a "contract by which specific property is hypothecated for the performance of an act, and without the necessity of a change of possession," (Civil Code, § 2920;) for no change of possession is provided for until a default, and not even then unless a large portion of the holders of the bonds secured demand it. The "lien" created is also "special, and is independent of possession," as is provided in regard to a mortgage in section 2923.

"A mortgage does not entitle the mortgagee to possession of the property unless authorized by express terms of the mortgage." Section 2927. "A power of sale may be conferred by a mortgage upon the mortgagee, or any other person, to be exercised after a breach of the obligation for which the mortgage is a security." Section 2932. This instrument provides for taking possession by the grantees named in it after default, and not before, and confers a power of sale upon them in the contingencies specified, they being persons other than the persons for whose security it is intended, just as these provisions of the statutes say may be done. The statutory definition of a mortgage does not say that the contract of hypothecation must be with the creditor, nor that the power of sale authorized to be given shall be given to him, but in express terms that the latter, at least, may be to "any other person."

So section 744 of the Code of Civil Procedure provides "that a mortgage of real property shall not be deemed a conveyance, *whatever its terms,* so as to enable the owner of the mortgage to recover possession of the real property without a foreclosure and sale."

Under this provision conveyances absolute in form, without any instrument of defeasance, if made to secure the payment of money, have often been held by the supreme court of California to be mortgages. This provision is a statutory recognition of the principle that mortgages may be made in various forms. Wherein, then, does the instrument in question fall short of being a mortgage within the definitions and various descriptions given in the several provisions of the statute cited?

But it may also contain the elements of a trust deed, as described in the statute, and fall within the definition of or embrace a trust. But is it any the less a mortgage? If the mortgage contains a power of sale to "any other person" than the mortgagee, and the Code says it may, it necessarily embraces a trust; but it does not necessarily carry the right of possession and control of the land, at least, before default. The sole purpose expressly appears in every part of the instrument in question to be to secure the payment of certain bonds, which are constantly and always, in the instrument and in the bonds themselves, called "first-mortgage bonds."

The authority from the board of directors to make the instrument recited in the instrument, is only authority to execute a mortgage; and there is no authority recited to execute any thing but a mortgage. And no other authority than that recited in the instrument appears in evidence. The resolution of the board of directors authorizing the

transaction according to the recitals, is only to execute a mortgage. The parties evidently supposed it was a mortgage, and it doubtless is a mortgage in substance, in law, and in fact, though it also creates a trust.

But suppose it creates a trust in the form in which the instrument is drawn, even under the provisions of the Code cited, the result must be the same. The substantial title and the present right of possession to the land under the express terms of the instrument, as executed, are in the grantor, and the trusts are limited by the terms of the instrument, as expressly provided by the Code. "Uses and trusts in relation to real property are those only which are specified in this title." Civil Code, § 847. And in the title it is provided that "express trusts may be created for any of the following purposes:" (1) "To sell real property, and apply or dispose of the proceeds in accordance with the instrument creating the trusts," etc., the power, if any, applicable to this case. Section 857, as amended. By section 863 it is provided: "Except as hereinafter otherwise provided, any express trust in real property, valid as such in its creation, vests the whole estate in the trustees, subject only to the execution of the trust. The beneficiaries take no estate or interest in the property, but may enforce the performance of the trust." That is to say, whatever the estate is, be it more or less, that passes by the terms of the conveyance, it all vests in the trustees, and not in the beneficiaries. But what the extent—the quantity or quality—of the estate is which passes to the trustees, depends wholly upon the terms of the instrument creating the trust. Its limits are defined by the terms of the instrument itself, and not by this provision of the Code. The instrument having defined the estate, the whole of that estate, as so defined, goes to the trustees, and not to the beneficiaries. The beneficiaries take none of the estate as between them and the trustees, but only the right to compel the performance of the trust. This provision regulates the rights as between the trustees and beneficiaries, and not between the "trustor," as the grantor is termed in the statute, and trustees. Those rights are determined by the terms of the instrument, or, in the language of the Code, as we have seen, "in accordance with the instrument creating the trust." The following sections carry out this idea: "Notwithstanding anything contained in the last section, the author of a trust may, in its creation, prescribe to whom the real property to which the trust relates shall belong in the event of the failure or termination of the trust, and may transfer or devise such property subject to the execution of the trust." Sec-

tion 864. "The grantee or devisee of real property subject to a trust acquires a legal estate in the property as against all persons except the trustees and those lawfully claiming under them." Section 865. How do they get a legal estate in the property unless their grantor or devisor has a legal estate in it?

And again: "Where an express trust is created in relation to real property, every estate not embraced in the trust and not otherwise disposed of, is left in the author of the trust, or his successors." Section 866. And, "when the purpose for which an express trust was created ceases the estate of the trustees also ceases." Section 871. No reconveyance is here required. The interest of the trustees ceases *ipso facto* and *eo instanter* upon the performance or ceasing of the trust. If the trustor, or his grantee, has "a legal estate in the property as against all persons except the trustees," even as against the beneficiary, where does a mere trespasser against all—trustor, trustee, and beneficiary alike—obtain a *status* wherein he can question the right of the trustor? Now, all that has been granted by this instrument is a security for the payment of the bond described—a right to have the lands sold and the proceeds applied, so far as is necessary, to the satisfaction of the bonds. All else remains in the plaintiff. The plaintiff has the entire estate in the land, subject only to the right of the bondholders to have the bonds satisfied out of their proceeds, in case some other provision for their payment is not made. The right is, therefore, wholly contingent. The plaintiff can, at its option, provide other means for payment, and, upon such payment from other sources, the trust, by express provision of both the statute and the instrument itself, ceases.

The Code, in another title and chapter, further provides: "The provisions of this chapter apply only to express trusts, created for the benefit of another than the trustor, and in which the title to the trust property is vested in the trustee." Civil Code, § 2250. And "the nature, extent, and object of a trust are expressed in the declaration of trust." Section 2253. Again: "A trustee must fulfil the purpose of the trust, as declared at its creation, and must follow all the directions of the trustor given at the time of its creation," etc. Section 2358. And still again: "A trustee is a general agent for the trust property. His authority is such as is conferred upon him by the declaration of trust and by this chapter, and none other." Section 2267. The provisions of this chapter, I suppose, refer to those trusts which are wholly for the benefit of third parties, wherein the title wholly passes to the trustee, there being nothing to be done for the benefit

of the trustor—nothing left in or to be returned to him; and not to that class of trusts, like the present, where the trustor is as much interested in the trust as the designated beneficiary himself—indeed, where he is the principal party in interest, and the beneficiary's interest is only an incident to some other right. Indeed, such is the express provisions of section 2250: "Trusts created for the benefit of another than the trustor." But suppose it to be otherwise, the result would be the same; for in this class of trusts, as in that referred to in the other title of the Code already cited, "the nature, extent, and object of the trust" are limited to those "expressed in the declaration of trust." The trustee must fulfil the purpose of the trust as declared at its creation, and must follow all the directions of the trustor given at the time. "He is but a general agent of the trust property, and his authority is such as is conferred upon him by the declaration of trust, and by this chapter, and none other." Section 2267. "So, in the other class of trusts already referred to, under which, if either, this case falls, every estate not embraced in the trust, and not otherwise disposed of, is left in the author of the trust." Thus, in either kind of trusts, the rights and powers of the trustee under the Code itself are defined and limited by the instrument creating the trust. What, then, are the purposes of the trust in question, and the powers, and the limitations upon those powers, of the trustees, Mills and Tevis? It is only necessary to glance at the passages of the instrument set out in the preliminary statement of the contents of the instrument, to find an answer to this inquiry. The express provisions of the instrument are so plain and specific that they do not admit of construction or doubt. The purpose, and only purpose, is to secure the payment of a loan of money raised upon bonds issued and secured by what is substantially a mortgage, and put upon the market in the usual form adopted by railroad companies.

The lands of the company, as well as the road, rolling stock, and all other appendages and equipments, are conveyed with a condition of defeasance. The granting part as to the lands is in the usual form of that class of real estate mortgages, except it says to "the said parties of the second part, *as trustees;*" and the *habendum* clause is, "unto the said parties of the second part * * * *as trustees,* for the uses and purposes, and upon the *trusts, terms, and conditions and agreements, in this indenture set forth and declared.*" It is not for any other purpose than as set forth in the instrument. The defeasance is as follows: "Provided, always, and these presents are

upon the express condition, that if the said party of the first part shall well and truly pay, or cause to be paid, to the holders of said bonds, and every of them, the principal sums of money therein mentioned, according the tenor thereof, with the interest thereon, at the times and in the manner hereinbefore provided, according to the true intent and meaning of these presents, then and from thenceforth *this indenture and the estate hereby granted shall cease and determine, and all the right, title, and interest in any and all property hereby conveyed to the parties of the second part, not then disposed of under the powers hereby conferred, shall revert to and vest in the said party of the first part.*"

The only change in this defeasance from the usual defeasance in an ordinary mortgage is in form, not in substance. Instead of saying, as in the usual form, "this indenture shall be null and void," the instrument says, "this indenture and the estate hereby granted shall cease and determine, and all the right, title, and interest in any and all property hereby conveyed to the parties of the second part, not then disposed of under the powers hereby conferred, shall revert to and vest in the said party of the first part." This is substantially the same as the provision of the statute already cited, which requires no reconveyance. It is true that further along in this instrument there is another clause providing for a reconveyance, which, under this provision, and the statute, seems to be superfluous.

But the instrument contains the following clause expressly limiting the rights of the trustees:

"These presents and the bonds are made, executed, and delivered upon the trusts, terms, conditions, and agreements following; that is to say: That all the lands hereinabove conveyed and mortgaged shall be under the sole and exclusive management and control of the said party of the first part, who shall have full power and authority to make contracts for the sale of the same, at such price, on such credit or terms of payment, and such other conditions as shall be agreed on by the said parties of the first and second parts, and as shall seem to them best calculated to secure the payment in full of all the bonds issued as hereinbefore provided, until entry or foreclosure by the trustee, as hereinafter provided. But no title to any tract of land contracted to be sold by the said party of the first part shall be given until the whole of the purchase money of said tract shall be paid to said parties of the second part, or their successors or survivor, in cash or in said bonds, or overdue coupons thereof. And for this purpose it is agreed that the said party of the first part and said trustees shall cause all such lands, as shall from time to time become subject to sale, to be carefully examined and surveyed, and shall affix to each tract or parcel such price as in their judgment shall be most judicious, having in view the interests of all parties; and said lands shall be

and remain at all times thereafter open for sale to any person who may desire to purchase and pay therefor,—the prices being, nevertheless, at all times subject to revision and alteration by the said parties; and the party of the first part may reserve from sale any lands necessary for depot grounds, or other purposes connected with the construction or operation of the said railroad or telegraph."

Thus, by the express terms of the trust, the lands hereinabove conveyed and mortgaged are to "be under the sole and exclusive management and control of the said party of the first part"—the plaintiff herein—"until entry and foreclosure by the trustees as hereinafter provided;" and the following is the provision hereinafter made:

"If any default shall be made in the payment either of principal or interest on any of said bonds for six months, after demand at the place of payment when the same shall become due, then the said trustees may, on being requested by the holders of at least $100,000 of such bonds, enter into and take possession of any of the lands above conveyed, and foreclose this mortgage; and may sell at public auction so much of said lands as may be necessary to discharge all arrears of such interest, and apply the proceeds, after deducting the costs, charges, and expenses of such entry, foreclosure, and sale, to the payment of such arrears of interest. If any such default shall continue for one year from the time of such demand and refusal, the principal sum of all bonds then outstanding shall become due and payable, and the said trustees may enter into and take possession of all the lands above by these presents mortgaged or conveyed, foreclose this mortgage, and sell at public auction all said lands, or so much thereof as may be necessary, first giving at least six months' previous notice of the time and place of sale, in at least one newspaper published in the city of New York, and in one published in each of the cities of San Francisco, Sacramento, Los Angeles, and San Diego; and they shall apply the proceeds thereof, after deducting the costs, charges, and expenses of such last-mentioned entry, foreclosure, and sale, to the payment of all said bonds then outstanding, and the interest accrued thereon, rendering the surplus, if any there shall be, unto the said party of the first part. In case of any sale upon any such foreclosure, or at any such public auction, the said trustees shall make, execute, and deliver a conveyance of the said lands so sold, which shall convey to the purchasers all the rights and privileges of the said party of the first part in and to the property so sold, to the same extent as the same shall have been previously enjoyed and held by the said party of the first part.

"If, after any such entry shall be made, or any such foreclosure proceedings shall be commenced, for the satisfying of interest only, as above provided, and before the lands are sold thereon, the said party of the first part shall pay and discharge such interest, and deliver the coupons therefor to the said trustees, and pay all the costs, charges, and expenses incurred in such entry and foreclosure, and the proceedings thereon; then, and in every such case, the

said trustees shall discontinue their proceedings thereon, and restore to the said party of the first part all of such lands, to be held subject to the above conveyance and mortgage, and subject to all the provisions, terms, and conditions of these presents, in like manner as if such entry had not been made, nor such foreclosure proceedings commenced."

So, by the express terms of the trust, the trustees have no right whatever to enter into or take possession of any of the lands above conveyed "until default," and not then, except "on being requested so to do by the holders of at least $100,000 of such bonds." And even then they are only authorized to take possession of and sell "so much of said lands as may be necessary to discharge all arrears of such interest," costs, etc. But if default continues "for one year from the time of such demand and refusal, the principal shall become due, and then the said trustees may enter into and take possession of all the lands by these presents mortgaged or conveyed, foreclose this mortgage, and sell  *  *  *  so much thereof as may be necessary," etc. But "if, after such entry shall be made, or any such foreclosure proceedings shall be commenced for the satisfying of interest only,  *  *  *  and before the lands are sold thereon, the said party of the first part shall pay and discharge such interest, etc.,  *  *  *  then, and in every such case, the said trustees shall discontinue their proceedings thereon, and restore to the said party of the first part all such lands, to be held subject to the above conveyance and mortgage, and subject to all the provisions, terms, and conditions of these presents, in like manner as if such entry had not been made, nor such foreclosure proceedings been commenced."

Thus it appears, by clear, express, positive provisions of the instrument creating the trust, so plain that there can be no possible ambiguity upon the point, that the said trustees had no right whatever to enter upon or take possession of said lands, or any portion of them, until the contingency of a default and demand by the bondholders had arisen; and, even then, upon the removal of the contingency by the plaintiff, they would be required to restore the management, control, and possession to the plaintiff. The present possession, management, and control of these lands were not any part of the estate conveyed to the trustees. "This estate" was not "embraced in the trust;" and, as we have already seen, under the Code, "every estate not embraced in the trust, and not otherwise disposed of, is left in the author of the trust." This estate was, therefore, left in the plaintiff, in this case—the author of the trust. In every aspect

of the case, then, whether regarded as a mortgage or a trust, and no matter which class of trusts, the right of action to recover possession of the lands as against trespassers is left in the plaintiff. Any other construction would take the road and its equipments from the possession, management, and control of the plaintiff, contrary to the expressed intention, and give them to the trustees; and thus not only prevent the company from operating the road already built, but, after the date of the instrument, prevent the construction and operation of any more road. It would defeat the very object for which the instrument was given, namely, to enable the plaintiff to build, equip, and operate the Southern Pacific Railroad.

Although the proceeds of sales of lands go into the hands of Mills and Tevis for the redemption of the bonds, even the power of sale is not in them, except after default. It is the plaintiff "who shall have full power and authority to make contracts for the sale of the land." But it shall be "at such price, on such terms of payment, and such other conditions as shall be agreed on by the said parties of the first and second part." Thus, while the management, control, and power to make the contracts is in the plaintiff, and not in the trustees, both the plaintiff and the trustees must agree on the price, and terms and conditions of the sale; and as a mode for fixing the terms of sale, it is provided further in the instrument that the plaintiff and the "trustees shall cause all such lands as shall from time to time become subject to sale, to be carefully examined and surveyed, and shall affix to each tract or parcel such price as in their judgment shall be judicious, having in view the interests of all parties, and said lands shall be and remain at all times thereafter open for sale to any person who may desire to purchase and pay therefor, the prices being, nevertheless, at all times subject to revision and alteration by the said parties."

It is in pursuance of this provision that the lands have been graded, and the prices fixed by the plaintiff and the trustees, acting together, which prices appear to have created the great dissatisfaction in various ways manifested by the several defendants in these various suits.

Since the execution of this instrument the fixing or changing of the established prices has been beyond the power of the plaintiff alone, without the concurrence of the trustees; and the trustees are bound, by the express terms of their trust, to consult the interests of the beneficiaries, and of all the parties in interest; that is to say, all

parties having an interest under this instrument. These lands, according to their reasonable full value, are a part of the security upon which the purchasers of the bonds secured are entitled to rely.

Another limitation upon the estate and the powers of the trustees is found in this instrument, in the provision that when any of these lands shall have been purchased and paid for, "the same shall be conveyed by the said parties of the first and second parts to the purchaser in fee-simple." So that the trustees have no power alone even to convey, except after default, upon foreclosure and sale. This is another evidence of the care which the plaintiff took to limit the extent of the estate, and the rights and powers vested in the trustees; and the limitations thus made in the instrument creating the trust must be the full measure of the rights and powers of the trustees.

The case of *Ellis* v. *Patterson*, in this court, cited by counsel, presented no such question as that involved in this case. The instrument was different in its provisions, and the object of the suit was to set aside conveyances made by the trustee under the power contained in the instrument, and for an account and redemption.

All the other contested points in this case, both of law and fact, have been before decided in this court against the defendant. They are all, or nearly all, questions that can only be litigated in a special proceeding for the purpose either between the plaintiff and the United States, or between the plaintiff and the state of California. It is no part of the defendant's duty to vindicate the rights either of the United States or the state of California; and he does not occupy a position that entitles him to do either.

Let there be findings and judgment in favor of the plaintiff in this and in the other cases submitted with it.